Mary McNamara, SBN 147131
Britt Evangelist, SBN 260457
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94112
Phone: (415) 477-3800
Fax: (415) 477-9010
Attorneys for CLARKE HOWATT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>CLARKE J. HOWATT,<br><br>    Defendant. | Case No.: CR 15-0101 CRB<br><br>**DEFENDANT CLARKE HOWATT'S SENTENCING MEMORANDUM** |

## I.   INTRODUCTION

For three and a half years, Mr. Howatt perpetrated very serious financial crimes. He stole some $3.8 million dollars in repeated thefts from accounts administered by ABAG. He did so using his authority over colleagues who had faith in him. The breach of trust was enormous. It also coincided with a change in Mr. Howatt's psychiatric medication (prescribed for what his doctor believed was unipolar depression) that appears to have triggered manic phases of a previously undiagnosed bipolar disorder.

Mr. Howatt was not manic during the entire period of the conduct, of course, but he was cycling through alternating periods of mania and depression that profoundly affected his judgment. The thefts were part of a pattern of grandiose and irrational

behavior that included deserting his wife and children, drinking heavily and spending money in alcohol-fueled binges.

While mental illness is not an excuse for his conduct, it does provide some context for the offense, as does his subsequent behavior in trying to atone for his crimes. For the past year, Mr. Howatt has been receiving appropriate medication for bipolar disorder. He is deeply remorseful. Immediately after his confession to both the United States Attorney's Office and his former colleagues, and before he pleaded guilty, he sold all of his assets to repay ABAG. He also asked his parents, and they agreed, to contribute $1.5 million to make up most of the shortfall in restitution. On the date of the guilty plea, ABAG received a total of $3,493,556.07. ABAG is satisfied with this restitution and seeks no further monetary orders from this Court. The government, the Probation Office and the defense agree that Mr. Howatt's acceptance of responsibility has been extraordinary and that a sentence falling somewhere (at varying levels) below strict application of the guidelines is warranted. This memo addresses the sentencing factors relevant to what the ultimate sentence should be.

## II.     THE OFFENSE CONDUCT

Sixteen years into his nineteen-year career at the Association of Bay Area Governments ("ABAG"), Clarke Howatt started to embezzle money held in ABAG-administered bond financing accounts associated with two developments, one in San Francisco (Rincon Hill) and one in Contra Costa County (Windemere Ranch).[1] Plea

---

[1]     Both Windemere and Rincon Hill were financed in part with municipal bonds. Windemere was financed by a combination of community facilities district ("CFD") bonds (established under the Mello-Roos Community Facilities Act of 1982) and assessment district bonds. Rincon Hill was financed with a CFD bond only. Each of these financing vehicles depends on identifying specific real property parcels within a defined district and imposing on those parcels a special tax/lien, payable on parity with real property taxes. The legal structures underlying these districts and the related bond financings are extremely complex. Relevant here is that these structures provide that

2

Agreement ¶ 2 at page 4.  Starting in 2011, Mr. Howatt began to steal this money.  For Windemere Ranch, the projects had been completed several years before the time that Mr. Howatt stole the money which was left in ABAG accounts.  Plea Agreement ¶ 2, page 4.  For Rincon Hill, the City of San Francisco was the due recipient of the money, to be spent on projects that it would decide to, but had not yet built (before Mr. Howatt made restitution, ABAG returned the stolen money to the City, making it whole).

     Mr. Howatt stole on four separate occasions.  He stole a very large amount– a total of $3,876,135.21.  On or about June 23, 2011, he stole $1,098,712.48 from an account associated with the Windemere development.  On or about June 24, 2014, he stole another $1,225,000.00 from an account also associated with Windemere.  On or about August 2014, he stole $1,296,340.66 from an account associated with the Rincon Hill project and on or about January 26, 2015, he stole a further $256,082.07 from an account associated with Windemere.  Through a routine account inquiry by a City of San Francisco employee, ABAG discovered the Rincon Hill theft.  Mr. Howatt resigned, promising to repay.  Presentence Report ("PSR"), ¶ 19.  On February 6, 2015 with no pre-conditions, Mr. Howatt walked into the United States Attorney's Office to confess in the presence of the FBI.  He told the government everything that he had done, including confessing to the three Windemere thefts that had not yet come to light.  On February 20, 2015, he met with his former colleagues at ABAG to tell them in person that he had stolen $3.8 million dollars.  He later met with ABAG's lawyers and cooperated in their investigation.  After the filing of the charging Information (he was not arrested) he continued to cooperate with ABAG and its lawyers.  He sold all of his assets to pay restitution before he entered his guilty plea.

---

money left over after the improvements are completed may be returned to developers who submit appropriate claims (backed up by receipts for expenditures).

Mr. Howatt's embezzlements constituted a terrible breach of the trust that ABAG had placed in him. He was the Public Finance Director of ABAG, and as such, had operated with a good deal of autonomy. He had a position of authority that contributed to his ability to execute the thefts and a history of helping to fund billions of dollars in financing for much-needed projects in the Bay Area, many of them involving low-income housing, hospitals and other public works. PSR ¶ 10; Letter of Les and Nina Howatt, dated February 9, 2016. He had a good reputation with lawyers, bankers and others working in the municipal bond world. *Id.* His seniority and track record carried weight with his colleagues -- he could not have stolen the money without abusing their trust and using his bond-finance skills. And, while as his mental health declined, he sometimes failed to appear at the office, he was able to coast on past accomplishments. His three-plus year, multi-million dollar embezzlement shocked everyone who knew him. Letters attached as Exh. A to Declaration of Mary McNamara.

## III.   SENTENCING FACTORS

Mr. Howatt's crimes are very serious. They lasted for three and a half years. They also coincided with a change in his psychiatric medications and a period of immense instability in his mental health. Mr. Howatt knew that he had mental health problems and had responsibly sought treatment. He had for years been under a psychiatrist's care for depression and had been on a regimen of a mood-stabilizer and an anti-depressant. In 2008, his psychiatrist took him off the mood stabilizer after an adverse reaction, but kept him on the anti-depressant. Later, Mr. Howatt was placed on a second anti-depressant. Report of Bryant Welch, J.D., Ph.D, ABPP, at 3. Thus, Mr. Howatt was on two anti-depressants, but no mood stabilizer. Unbeknownst to the psychiatrist, Mr. Howatt began to experience rushes of elation, hyperactivity and unrealistic optimism after this medication switch, while still experiencing cycles of deep depression. *Id*. Like many who do not recognize the symptoms of bipolar disorder, Mr.

Howatt did not see the new feelings of elation and energy – which made him feel good – as symptoms of a disease, and he did not report them to his doctor. He also began to drink very heavily, a common coping mechanism for bipolar patients trying to control the rush of manic highs. *Id.* Although he still saw his psychiatrist sporadically, he was focused only on the painful and familiar depressive cycles. Mr. Howatt remained off mood stabilizers during the period in which he committed the offense conduct. As Dr. Welch states in his report, treatment of bipolar disorder is difficult and people often do not seek treatment for manic elation. But, mood stabilizers are extremely important for those suffering from bipolar disorder (though not for those with unipolar depression, which is how Mr. Howatt had presented to his psychiatrist). Dr. Welch notes that, with bipolar patients who do not report the manic symptoms, there is a "danger of using the wrong medicines that can then play havoc with bipolar illness by energetically triggering off the manic phase of the disorder." Welch Report at 2-3.

While, as discussed later, all parties agree that a below-guidelines sentence is appropriate for early and extraordinary acceptance of responsibility, the plea agreement is silent on mental illness. The Probation Office has recommended a variance on that basis as well as on extraordinary acceptance, but the government opposes such a variance. The defense notes that, there is a new recognition of the role that mental illness should play in reaching an appropriate sentence. In 2010, in response to its "multi-year study of alternatives to incarceration" (see USSG App. C, Vol. III at 343, Amendment 738), the Sentencing Commission amended the status of mental and emotional conditions from a specific offender characteristic that is "not ordinarily relevant" to one that "may be relevant." where the conditions are "present to an unusual degree" that "distinguish[es] the case from the typical cases covered by the

5

guidelines." USSG App. C, Vol. III at 348 (Amendment 739) (codified at USSG § 5H1.3) ("Policy Statement")); *see* USSG § 5K2.0(a)(1) (downward departures generally).[2]

Courts view these amendments (easing the path for mental illness-based departures) as instructive also in assessing variances under section 3553. For example, in *United States v. Ferguson*, 942 F. Supp. 2d 1186, 1191-94 (M.D. Ala. 2013), the court reasoned that "the amendments demonstrate that, where mental illness or cognitive deficits are a contributing factor greatly or even only limitedly in a crime, such defendants are more likely less-deserving of punishment for punishment's sake than are those without such limitations. … [And] it can now be reasonably argued that, in fashioning an appropriate sentence, courts are now required to consider, and factor in, a defendant's mental illness if they are to be faithful to § 3553(a)." *Id*. at 1194; *see also United States v. Flowers*, 946 F. Supp. 2d 1295, 1296 (M.D. Ala. 2013) (citing *Ferguson* and varying downward from 14 months to probation because the defendant's diminished culpability due to mental illness, her need for treatment outside of prison, and the six-month-home-confinement term while on pretrial supervision).[3]

---

[2] The amendment also reiterates that a downward departure for mental or emotional conditions may be used to accomplish a specific-treatment purpose. USSG App. C, Vol. III at 348 (Amendment 739) (codified at USSG § 5H1.3). An application note to Amendment 738, for the first time authorizes departure from "Zone C" of the sentencing table (which requires prison for at least half the minimum term) to "Zone B" (which does not require prison) in order to achieve a "specific treatment purpose." *Id.* at 343 (codified at USSG § 5C1.1, comment. (n.6)). Under the new guideline, departure is appropriate in cases where the defendant "suffers from a significant mental illness, and the defendant's criminality is related to [that illness]," though courts must additionally consider the likelihood that treatment will address the defendant's mental illness as well as the risk to the public absent incarceration. *Id.*

[3] Of course, courts varied downward on mental health condition before these amendments. See e.g., *United States v. Ruff*, 535 F.3d 999, 1001-02 (9th Cir. 2008) (affirming downward variance from 30-37 month range to 12 months and a day in

6

It is clear that Mr. Howatt is bipolar -- he has a strong family history of the illness – his daughter is the third generation of his family to suffer from it. His behavior during the offense conduct, but not before, reflects a typical bipolar pattern. Welch Report at 3-4. Bipolar disorder in its manic phases is characterized by extremely poor judgment, erratic behavior, inappropriate spending, and often the co-occurrence of substance abuse. *Id., passim*. Mr. Howatt displayed all of these characteristics. He spent the stolen money on a series of grandiose purchases: an ostentatious holiday home on the Oregon coast; a series of showy vintage cars, motorcycles and boats that he never used; original art in styles that few collected; lavish vacations. All of these purchases were inconsistent with Mr. Howatt's lifelong frugality, modesty and restraint. Welch Report at 3. He drank heavily and spent money in alcohol-fueled binges. *Id.* The thefts themselves are in conflict with Mr. Howatt's history as a careful steward of bond money. For twenty-two years of their twenty-seven year marriage, Jenny Howatt's view of her husband was that he was "a very moral and ethical man." PSR ¶ 53. And yet, he repeatedly stole vast amounts of the money that he was entrusted with, only to spend it all in alcohol-fueled frenzies. Most out-of-character of all was Mr. Howatt's behavior towards his wife and children. He had been a family man, involved with his children, coaching their team sports, proud of their achievements, and, in Jenny Howatt's words, a "thoughtful, intelligent and sensitive" man. PSR ¶ 53. His family could not recognize the person who deserted his wife and children in a blaze of volatile behavior. PSR ¶ 53 (for Jenny Howatt, his crimes are the

---

fraud/embezzlement case because of mitigating factors including, history of strong employment, cooperation and clear remorse, support from his siblings, absence of potential risk to the public and the appropriateness of restitution, and his mental health and gambling addiction; *United States v. Clark*, No. 07-123, 2008 WL 2940527 (E.D. Wis. July 25, 2008) (downward variance from 18-24 months to probation in drug case where middle-aged defendant had become addicted to cocaine after a series of family tragedies, serious medical problems, and the loss of her long-time job).

result of medication imbalances and '"sinking into a deep hole;"' for Les and Nina Howatt, "Clarke's behavior is completely foreign to anything we have known in the past." Letter of Les and Nina Howatt, dated February 9, 2016 at page 1.)   Mr. Howatt's friends and relatives all attest to his good character and his intense remorse for what he has done.  See, e.g., Letter from sister, Janis Howatt, M.D., ("[he] has been ashamed of his actions and on any shadow it may cast over the organization that he worked for and his family"); Letter from uncle, Clarke T. Howatt, ("[Clarke J. Howatt's] actions "seemed incomprehensible and absolutely out of character … for all his life to this point he has exhibited strength of character"); Letter from childhood physician Walter E. Norton, M.D. (Mr. Howatt is "tender hearted and kind" and his criminal conduct "is so out of character from what I have observed and know about him.")

While nobody can definitively say that the medication change was the cause of Mr. Howatt's criminality (by causing mania), the criminality overlapped in time with the medication switch and, as set forth above, it appears to have played some considerable role.  It is clear that the medication he received during the offense conduct was not appropriate for his true condition and actually increased the chances of his becoming manic. PSR, ¶¶ 60, 61, 53; Welch Report at 3.  Of course, Mr. Howatt was not in a continuous manic phase during the entire offense conduct, but he was mentally destabilized and cycling through uncontrolled periods of mania and depression.  Extremely poor judgment and grandiose behavior were the result.  In short, the money left over after the municipal projects had been completed was no longer taboo.  Welch Report at 1, 4.  That he could complete tasks such as preparing the types of documents necessary to transfer funds, tasks that he had performed for years in countless legitimate deals, does not suggest that he was mentally healthy.

Mr. Howatt, now properly medicated, is deeply remorseful for his conduct.  He has done everything he could to make amends and he did so before he entered his

8

guilty plea.  Mr. Howatt liquidated all of his assets in order to repay ABAG.  With the agreement of the United States Attorney's Office, he sold all of the real property he held (the Pacific City vacation house, a condominium), marshaled the proceeds of the earlier sale of his marital home and liquidated all other assets in order to pay restitution to ABAG.  In this way, Mr. Howatt collected $1,637,355.11 in restitution.  In addition, he consented to the forfeiture of $356,200.96 from his bank accounts to be paid in restitution.  Finally, out of a sense of moral obligation to make amends for the wrongs of their son, Mr. Howatt's parents voluntarily contributed a further $1,500,000 of their own money to help repay ABAG.  Letter of Les and Nina Howatt, re restitution (parents used savings, reserve funds and loans to come up with the $1.5 million that they contributed.)  The total paid by Mr. Howatt and his parents by the time of the guilty plea was $3,493,556.07.  Although this amount falls short of the $3,876,135.21 that Mr. Howatt took, ABAG is satisfied with the settlement and does not seek a restitution judgment for the shortfall.  PSR ¶ 22. [4]  Mr. Howatt is now destitute.

## IV.    CONCLUSION

Mr. Howatt's crimes are serious, they inflicted harm on ABAG and they warrant punishment.  The Court must decide what sentence is appropriate under the sentencing factors in Section 3553 – the plea agreement does not foreclose a variance.  In addition to the offense conduct, consideration of the following circumstances is appropriate.  Mr. Howatt confessed early to prosecutors, the FBI, his former colleagues and the lawyers tasked with investigating his conduct.  In addition to the $1.9 million that he obtained

---

[4] The plea agreement provides that, in light of the settlement with ABAG, seeking a restitution judgment would require determination of complex issues of fact and would complicate or prolong the sentencing process to a degree that would place an undue burden on the sentencing process.  Plea Agreement, ¶ 9 (in part because it would require the Court to determine what prices the real property would have fetched but for the shortened sales timeline).

from liquidating his assets/cash to pay restitution, his parents sacrificed to come up with an additional $1.5 million.  ABAG is satisfied with restitution, which was paid before entry of the guilty plea.  During the offense conduct, Mr. Howatt suffered from untreated bipolar disorder and exhibited all the signs of manic and depressive cycles of behavior.  He is now receiving appropriate treatment, which will be for life.

Mr. Howatt feels the deepest shame for what he did.  He has done everything in his power to atone for what he did.  But he is acutely aware of and profoundly sorry for inflicting harm on ABAG, on his colleagues and on his family.

He will have to live with the consequences.  As his parents put it, "[h]is life is a shambles, his family life is ruined and his distinguished career in public finance is over."  Letter of Les and Nina Howatt, dated February 9, 2016.  Most painful to him, he is in the midst of a divorce from his wife, who though she recognizes that mental illness explains much of Mr. Howatt's recent conduct toward her, can no longer be married to him.  Although he still sees his daughters, his relationship with them has been severely damaged by his desertion of them as teenagers.  Mr. Howatt has lost everything except for the support of his parents and family who have responded to him with infinite compassion.  Mr. Howatt's chances for mental recovery are good, provided that he continues on his medication with careful monitoring, receives alcohol addiction treatment and mental health therapy.  He appears to be at very low risk of recidivism.

The defense asks for a sentence sufficient but not greater than necessary to serve the sentencing purposes of Section 3553.

DATED: March 16, 2016               Respectfully submitted,


                                    _____/s/_____
                                    MARY McNAMARA
                                    BRITT EVANGELIST
                                    Swanson & McNamara LLP
                                    Attorneys for Clarke J. Howatt